[No. 36687-8-II.   Division Two.   September 3, 2008.]

SOUTH TACOMA WAY, LLC, *Appellant*, v. THE STATE OF WASHINGTON ET AL., *Respondents*.

*Robert G. Casey*; and *Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/Fitzpatrick, PLLC*), for appellant.

*Robert M. McKenna, Attorney General*, and *Ann E. Salay, Assistant*; and *Patrick J. Mullaney* and *Ramsey E. Ramerman* (of *Foster Pepper, PLLC*), for respondents.

¶1 QUINN-BRINTNALL, J. — South Tacoma Way, LLC, appeals the trial court's grant of summary judgment in favor of the Washington State Department of Transportation (DOT) and Sustainable Urban Development # 1, LLC, arguing that (1) DOT's private sale of an alley to Sustainable without complying with RCW 47.12.063's notice requirements was ultra vires, (2) contracts in violation of RCW 47.12.063 are necessarily void, and (3) Sustainable is not a bona fide purchaser for value. Sustainable and DOT counter that (1) South Tacoma does not have standing and (2) the doctrines of laches and estoppel bar its claims. We hold that, because DOT violated RCW 47.12.063 when it sold the alley to Sustainable, the sale is ultra vires and void. Accordingly, we reverse.

## FACTS

FACTUAL BACKGROUND

¶2 From 1969 to 2006, Frances V. Staub, as FVS, LLC, owned a commercial building located on Airport Way south

of downtown Seattle (Staub property). FVS leased the building to Romaine Electric, a starter and alternator business owned by Frances's[1] son, Nicholas Staub. The Staub building abutted the northeast side of a 5,373 square foot alley that DOT owned. The Frye Free Public Art Museum owned property that abutted the alley along its full length to the west and also partially abutted it on the east. While Frye owned most of the other property surrounding the alley, Timmi I. Marshall owned a small parcel abutting the north end of the alley.[2] In addition to the Staub property, Nicholas leased a parking lot and 24,000 square feet of building space from Frye for Romaine Electric.

¶3 Because Romaine Electric was outgrowing the Staub building, Nicholas stored materials in DOT's alley. In order to legitimize his use of the alley, in 2001, Nicholas offered to purchase or lease the alley from DOT.[3] But after speaking with DOT, he abandoned the idea because he "got the impression that it was going to be more expensive than [he] was willing to pay to lease it." Clerk's Papers (CP) at 365. DOT told Nicholas that it would contact him in the future if DOT decided to sell the alley.

¶4 In 2004, Seattle-based land developer Sustainable purchased two parcels of unconnected land abutting the alley from Frye for $13,500,000.[4] Sustainable also expressed an interest in purchasing the Staub property but Nicholas refused because he believed the offer was for "less than the market value." CP at 98. But despite the failed purchase, Sustainable and the Staubs had a business relationship: Nicholas continued to lease the parking lot

---

[1] Frances Staub's and Nicholas Staub's first names are used for clarity.

[2] Marshall is not a party to this action.

[3] Although she was the actual owner of the Staub property, Frances was not involved in any of the discussions with DOT in 2001-02 regarding purchase or lease of the alley, and she had no interest in purchasing the alley at that time. Nicholas seems to have acted in her place.

[4] Sustainable purchased approximately 5.84 acres of property. One of the parcels was next to the Staub building.

and the 24,000 square feet of building space it had previously leased from Frye.

¶5 In May 2004, Sustainable approached DOT about purchasing the alley. According to DOT, on February 15, 2005, it determined that the alley was surplus property because it no longer used the alley for transportation purposes. On August 23, 2005, DOT sold the alley to Sustainable by quitclaim deed for its full appraised value of $180,000.

¶6 DOT maintains that, when it sold the alley to Sustainable, it mistakenly believed that Sustainable was the only landowner with property abutting the alley. As a result, DOT followed the procedure for sale to a single interested party, rather than the procedure that applies when there is more than one abutting landowner.[5] Under circumstances involving multiple abutting owners, DOT is required to give all abutting landowners written notice of the proposed sale and, if two or more abutting property owners provide timely notice (15 days) of their interest in the property, DOT is required to hold a public auction.[6] *See* RCW 47.12.063(2)(g), .283. Nicholas testified

---

[5] RCW 47.12.063(2)(g) provides that DOT may sell the surplus property to

[a]ny abutting private owner but only after each other abutting private owner (if any), as shown in the records of the county assessor, is notified in writing of the proposed sale. If more than one abutting private owner requests in writing the right to purchase the property within fifteen days after receiving notice of the proposed sale, the property shall be sold at public auction in the manner provided in RCW 47.12.283.

[6] RCW 47.12.283 provides:

(1) Whenever the department of transportation determines that any real property owned by the state of Washington and under the jurisdiction of the department is no longer required for highway purposes and that it is in the public interest to do so, the department may, in its discretion, sell the property under RCW 47.12.063 or under subsections (2) through (6) of this section.

(2) Whenever the department determines to sell real property under its jurisdiction at public auction, the department shall first give notice . . . in the area where the property to be sold is located. . . .

(3) The department shall sell the property at the public auction . . . to the highest and best bidder providing the bid is equal to or higher than the appraised fair market value of the property.

(4) If no bids are received at the auction or if all bids are rejected, the department may, in its discretion, enter into negotiations for the sale of the

that, if DOT had notified him as required by the statute, he would have asked DOT to auction the alley.

¶7 In mid-2004 or early 2005, Glen Sheiber of Sustainable spoke with Nicholas and, as a result of that conversation, Nicholas believed that Sustainable had already purchased the alley.[7] Although Nicholas was surprised that DOT had not contacted him in advance about the alley sale, he was not aware that DOT was statutorily obligated to notify him of the sale or that he had a right to object to the sale and request a public auction. In September 2005, Sheiber sent Nicholas an e-mail again announcing Sustainable's alley purchase and asking Nicholas to clear out any materials Romaine Electric had stored there. Shortly thereafter, Jeff Shoenfeld, another of Sustainable's principals, sent Nicholas an e-mail in which he informed Nicholas that Sustainable would continue to let him "use the alley at no charge through the end of the year [December 31, 2005]." CP at 514.

¶8 During the same period that DOT and Sustainable were negotiating the sale of the alley, Nicholas was seeking a larger facility for Romaine Electric, and Frances put the Staub building up for sale. In the autumn of 2005, South Tacoma sought to purchase the Staub building as a location for its business, Performance Radiator. During negotiations, Tim Pavolka of South Tacoma asked Nicholas about

property or may list the property with a licensed real estate broker [for no] less than the property's appraised fair market value. . . .

(5) Before the department shall approve any offer for the purchase of real property having an appraised value of more than ten thousand dollars, [under subsection (4)], the department shall first publish a notice of the proposed sale in a local newspaper of general circulation in the area where the property is located. The notice shall include a description of the property, the selling price, the terms of the sale, including the price and interest rate if sold by real estate contract, and the name and address of the department employee or the real estate broker handling the transaction. The notice shall further state that any person may, within ten days after the publication of the notice, deliver to the designated state employee or real estate broker a written offer to purchase the property for not less than ten percent more than the negotiated sale price, subject to the same terms and conditions. . . .

(6) All moneys received pursuant to this section . . . shall be deposited in the motor vehicle fund.

[7] In fact, the sale of the alley was not complete at that time.

the alley because Pavolka believed that the Staub building needed earthquake retrofitting that would require use of the alley. Nicholas replied that he believed DOT owned the alley. While conducting South Tacoma's "due diligence" on the Staub property prior to the purchase, Pavolka contacted DOT about the possibility of purchasing the alley. DOT informed him that it had already sold the alley to Sustainable. At that time, Pavolka informed DOT that it had failed to notify Frances, an abutting landowner.

¶9 In response to learning that it had failed to comply with the statutory requirements, DOT sent a letter to Frances, asking her to waive her right to notice as an abutting landowner retroactively. Nicholas responded by e-mail on her behalf, refusing to waive any of her rights. In addition, Nicholas expressed an interest in the alley and asked for more information regarding the sale. DOT admitted that it had violated the abutting landowner notice requirement of RCW 47.12.063 but stated that, because Sustainable was a "bona fide purchaser for value," it could not void the sale. CP at 167. DOT also asserted that Frances could not prove that she would have been the high bidder had DOT followed the statute.

¶10 Although the alley had not been a factor in the purchase price for the Staub property, South Tacoma and Nicholas decided to use DOT's error as leverage in negotiations with Sustainable; specifically, Nicholas hoped to use the error to obtain an early termination of Romaine Electric's lease with Sustainable for the building space and parking lot.[8] On February 12, 2006, Frances assigned any potential claims she had to the alleyway to South Tacoma and, in exchange, South Tacoma agreed to attempt to negotiate an early lease termination from Sustainable.

---

[8] Nicholas had been trying to negotiate an early release from its lease with Sustainable but Sustainable had refused to give him any relief. As a result, Nicholas and South Tacoma discussed "the potential of trading the early vacation of the lease for us agreeing to show no interest in the alleyway." CP at 366.

Procedural History

¶11 After South Tacoma completed the purchase of the Staub building, it filed this declaratory judgment action, asking the trial court to declare the sale of the alley to Sustainable void because it was ultra vires. Sustainable and DOT joined to defend the action and filed joint pleadings. On cross motions for summary judgment, the trial court ruled in favor of Sustainable and DOT. The trial court ruled that, although DOT failed to comply with RCW 47.12.063(2)(g), the transaction was not ultra vires because DOT was authorized to sell the property at fair market value. The trial court further reasoned that, because the legislature did not expressly provide that a state agency's failure to follow the notice requirement in RCW 47.12.063 rendered the contract void, and the sale did not thwart the legislature's intent, the notice defect did not render the contract void. The trial court also found that South Tacoma had failed to prove that it would have prevailed in the bidding if DOT had held an auction. Lastly, the trial court concluded that Sustainable was a bona fide purchaser for value and was entitled to rely on the deed that DOT conveyed.

ANALYSIS

Standard of Review

¶12 We review an order on summary judgment de novo.[9] *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

---

[9] It appears that, because the parties stipulated to the facts, the trial court reached the merits and decided the issues of law under CR 40(a)(2), instead of as a proper summary judgment motion. But we review this matter under the summary judgment standard because the parties and the lower court treated it as such.

of law." CR 56(c). We view all facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Summary judgment is appropriate only if reasonable persons could reach but one conclusion from all the evidence. *Vallandigham*, 154 Wn.2d at 26.

STANDING

¶13 As an initial matter, Sustainable and DOT argue that South Tacoma does not have standing to "make a post-contract challenge based on [DOT's] failure to comply with the procedural requirements" of RCW 47.12.063 because "only someone with *taxpayer standing* may challenge [a] contract" with DOT, and South Tacoma failed to properly plead taxpayer standing.[10] Br. of Resp't at 21. We disagree.

¶14 Here, although South Tacoma did not plead taxpayer standing, it was unnecessary for it to do so. When South Tacoma purchased the Staub property, Frances transferred and assigned "any and all claims and causes of action which may exist against [DOT] and/or [Sustainable] concerning the sale by [DOT] to [Sustainable]" of the alleyway. CP at 249. As a result, South Tacoma became the party in interest in whose name suit could be filed against DOT and Sustainable and, thus, South Tacoma has standing to bring the instant suit. *See Styner v. England*, 40 Wn. App. 386, 389-90, 699 P.2d 234 (1985) (partnership that bought stock from a brokerage house and received a formal assignment of the brokerage house's chose in action against defaulting customer had standing to assert brokerage house's claim against customer).

---

[10] Sustainable and DOT also argue that South Tacoma does not have standing because the laws governing competitive bidding are enacted for the benefit of the general public, not an individual bidder, and, thus, the bidder's interest in a fair forum is secondary. But this argument fails because competitive bidding did not take place; the issue here is not whether the forum in which bidding took place was fair but, rather, whether South Tacoma being denied the right to bid at all as a result of DOT's failure to notify South Tacoma's predecessors was lawful.

■■ ¶15 Furthermore, South Tacoma brought this suit as a Uniform Declaratory Judgments Act (UDJA) claim, ch. 7.24 RCW. Under the UDJA, an action can be brought by

> [a] person interested under a deed, will, written contract or other writings constituting a contract, *or whose rights, status or other legal relations are affected by a statute,* municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

RCW 7.24.020 (emphasis added).

¶16 In order to have standing to seek declaratory judgment under the UDJA, a party must present a justiciable controversy, which is

> "(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) *between parties having genuine and opposing interests,* (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

*Branson v. Port of Seattle,* 152 Wn.2d 862, 877, 101 P.3d 67 (2004) (alteration in original) (internal quotation marks omitted) (quoting *To-Ro Trade Shows v. Collins,* 144 Wn.2d 403, 411, 27 P.3d 1149 (2001), *cert. denied,* 535 U.S. 931 (2002)).

¶17 Here, not only does South Tacoma have standing as the Staubs' assignee but it also has standing under the UDJA: the controversy is actual, present, and existing between opposing parties; the interests are direct and substantial; and a judicial determination will be final and conclusive.

LACHES

¶18 DOT and Sustainable argue that the doctrine of laches bars South Tacoma's claim because Frances, through Nicholas, knew about the sale for over one year but did not

object or express any interest in the alley.[11] Because Frances did not delay for a time period sufficient to satisfy laches, we disagree.

¶19 "Laches" is an " 'implied waiver arising from knowledge of existing conditions and acquiescence in them.' " *Lopp v. Peninsula Sch. Dist. No. 401*, 90 Wn.2d 754, 759, 585 P.2d 801 (1978) (plaintiff barred by laches from challenging the school district's decision to issue general obligation bonds because he failed to exercise his rights before the sale was approved or notify the district of his objections until he filed suit (quoting *Buell v. City of Bremerton*, 80 Wn.2d 518, 522, 495 P.2d 1358 (1972))).

> "The elements of laches are (1) knowledge or reasonable opportunity to discover on the part of a potential plaintiff that he has a cause of action against a defendant; (2) an unreasonable delay by the plaintiff in commencing that cause of action; (3) damage to defendant resulting from the unreasonable delay."

*Lopp*, 90 Wn.2d at 759 (quoting *Buell*, 80 Wn.2d at 522). Damage to the defendant can arise either from acquiescence in the act or from a change in conditions. *Lopp*, 90 Wn.2d at 759-60. But laches is an extraordinary remedy that a party should not, under ordinary circumstances, employ to bar an action short of the applicable statute of limitations. *Brost v. L.A.N.D., Inc.*, 37 Wn. App. 372, 375, 680 P.2d 453 (1984).

¶20 Here, Nicholas knew about the sale for a year and had received information from Sustainable about the sale twice in September 2005; although Nicholas did not object on his mother's behalf until January 2006, South Tacoma objected on Frances's behalf in November 2005. Thus, Frances did not delay for a time period sufficient to satisfy laches. *See Davidson v. State*, 116 Wn.2d 13, 27, 802 P.2d 1374 (1991) (claim barred by laches after it had been delayed for more than 60 years); *Harmony at Madrona*

---

[11] We address the issue of laches because, by reaching the merits of this case, the trial court necessarily found that laches did not bar the claim.

*Park Owners Ass'n v. Madison Harmony Dev. Inc.*, 143 Wn. App. 345, 177 P.3d 755 (2008) (reasonable minds could differ as to whether an 18-month delay is an "unreasonable" delay for the purposes of laches).

ULTRA VIRES

¶21 South Tacoma argues that, because DOT failed to notify all abutting landowners of its intent to sell the alley as required by RCW 47.12.063(2)(g), DOT acted outside the scope of its authority and, as a result, the sale was ultra vires and void. We agree.

¶22 An administrative agency has only those powers expressly granted or necessarily implied by statute. *Props. Four, Inc. v. State*, 125 Wn. App. 108, 117, 105 P.3d 416, *review denied*, 155 Wn.2d 1003 (2005). When a state agency enters into a contract that is completely outside of its authority, i.e., ultra vires, or enters into a contract that violates public policy or a statutory scheme, the contract is void and unenforceable. *See Finch v. Matthews*, 74 Wn.2d 161, 172, 443 P.2d 833 (1968); *see also Pierce County v. State*, 159 Wn.2d 16, 55-56, 148 P.3d 1002 (2006) (quoting *Failor's Pharm. v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 499, 886 P.2d 147 (1994)).

¶23 But in determining what acts of a government body are ultra vires and void, courts must distinguish between those acts that are done wholly without legal authorization or in direct violation of existing statutes and those acts that are within the scope of the broad governmental powers conferred, granted, or delegated but which powers have been exercised in an irregular manner or through unauthorized procedural means. *Finch*, 74 Wn.2d at 172. Thus, state action that is " 'within [its] realm of power, albeit imprudent or violative of a statutory directive, is not ultra vires.' " *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 761, 863 P.2d 535 (1993) (quoting *Bd. of Regents of Univ. of Wash. v. City of Seattle*, 108 Wn.2d 545, 552, 741 P.2d 11 (1987)). And "statutory directives" are "acts that violate procedure rather than acts that violate

statute[s]." *Kramarevcky*, 122 Wn.2d at 761 n.6 (a "directive" is " 'a general instruction as to conduct or procedure' " (quoting Webster's New International Dictionary 738 (2d ed. 1956))).

¶24 Here, by enacting RCW 47.12.063, there is no question that the legislature gave DOT authority to determine when it no longer needs property under its jurisdiction for transportation purposes and to sell that surplus property at its fair market value or greater for the benefit of the state's motor vehicle fund. *See* RCW 47.12.063(2), (5). But the notice requirement in RCW 47.12.063(2)(g) is an express limitation on DOT's grant of authority: RCW 47.12.063(2)(g) authorizes DOT to sell surplus property to an abutting landowner *"only* after each other abutting private owner . . . is notified in writing of the proposed sale." (Emphasis added.) As a result, DOT did not have the authority to sell the alley to Sustainable without first notifying Frances of the proposed sale; RCW 47.12.063(2)(g) conditioned DOT's authority to sell the alley to Sustainable on first notifying Frances and giving her the opportunity to request a public auction. Furthermore, DOT's argument that it did not know that the Staubs were abutting landowners lacks merit because DOT had previously dealt with Nicholas when he inquired about purchasing the alley and checking the assessor's web site to verify whether there were any abutting landowners would have been simple. Because DOT failed to follow the requirements of RCW 47.12.063(2)(g) when it sold the alley to Sustainable, the sale is ultra vires and void.[12]

---

[12] Sustainable and DOT argue that, even if this court finds that the sale is ultra vires, it is not necessarily void because RCW 47.12.063(2)(g) does not expressly state that violative sales are void. But Washington courts have made clear that ultra vires contracts are void and unenforceable. *Finch*, 74 Wn.2d at 172. No Washington court has held that ultra vires contracts are void only if the legislature provides it; to the contrary, Washington courts have voided ultra vires actions without requiring any express statutory mandate from the legislature. *See, e.g.*, *Noel v. Cole*, 98 Wn.2d 375, 381, 655 P.2d 245 (1982).

BONA FIDE PURCHASER DOCTRINE

■■ ■■ ¶25 South Tacoma argues that the trial court erred when it applied the bona fide purchaser doctrine and concluded that Sustainable's claim to the property was superior to South Tacoma's claim to the property.[13] Specifically, South Tacoma argues that the bona fide purchaser doctrine does not apply to contracts that are ultra vires. We agree.

¶26 The bona fide purchaser doctrine provides that a good faith purchaser for value who is without actual or constructive knowledge of another's interest in real property purchased has a superior interest in the property. *Levien v. Fiala*, 79 Wn. App. 294, 298, 902 P.2d 170 (1995). Purchasers of real property may take advantage of the doctrine. *Tomlinson v. Clarke*, 118 Wn.2d 498, 500, 825 P.2d 706 (1992). "The notice 'need not be actual, nor amount to full knowledge.'" *Casa del Rey v. Hart*, 110 Wn.2d 65, 70, 750 P.2d 261 (1988) (internal quotation marks omitted) (quoting *Miebach v. Colasurdo*, 102 Wn.2d 170, 175, 685 P.2d 1074 (1984)). Constructive notice may be given either by means of a public record or by inquiry notice. *Ellingsen v. Franklin County*, 117 Wn.2d 24, 33, 810 P.2d 910 (1991) (Smith, J., dissenting) (citing, *e.g.*, *Paganelli v. Swendsen*, 50 Wn.2d 304, 308-09, 311 P.2d 676 (1957)). Whether a person is a bona fide purchaser is a mixed question of law and fact. *Miebach*, 102 Wn.2d at 175. What a purchaser knew is a factual question, but the legal significance of what he knew is a legal question. *Peoples Nat'l Bank of Wash. v.*

---

[13] South Tacoma also argues that the policies behind the bona fide purchaser doctrine "give way to protection of the public interest" and, as a result, should not protect Sustainable. Br. of Appellant at 20 (citing *Laborers Local Union No. 374 v. Felton Constr. Co.*, 98 Wn.2d 121, 133-35, 654 P.2d 67 (1982)). But South Tacoma relies on the dissenting opinion in *Laborers* to support its argument, a fact that it failed to bring to this court's attention, and offers this court no further authority. Thus, we do consider its superior claim argument. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986) ("Contentions unsupported by argument or citation of authority will not be considered on appeal."), *review denied*, 107 Wn.2d 1020, *cert. denied*, 482 U.S. 916 (1987).

*Birney's Enters., Inc.*, 54 Wn. App. 668, 674, 775 P.2d 466 (1989).

¶27 Whether the bona fide purchaser doctrine can cure an ultra vires sale of state-owned land is a novel issue of law in Washington. But federal case law has found that a municipal bond issued ultra vires is void even as to bona fide purchasers for value. *See Henderson County, Tennessee v. Sovereign Camp, W.O.W.*, 12 F.2d 883, 885 (6th Cir.), *cert. denied*, 273 U.S. 721 (1926). Furthermore, other equitable principles, such as equitable estoppel, are unavailable when a state agency has improperly exceeded its statutory authority. *See Finch*, 74 Wn.2d at 172 (courts may apply equitable estoppel against a claim of a municipality *only* if its acts are within general powers granted to that municipality); *see also Barendregt v. Walla Walla Sch. Dist. No. 140*, 26 Wn. App. 246, 249-50, 611 P.2d 1385 (allowing private parties to assert estoppel against state agencies that act without authority would thwart the public interest in limiting agency power, especially in cases where the public treasury is concerned), *review denied*, 94 Wn.2d 1005 (1980). By analogy, because DOT's actions were ultra vires, the bona fide purchaser doctrine does not protect Sustainable.

¶28 Accordingly, because DOT's private sale of the alley to Sustainable was ultra vires and void, even as to bona fide purchasers for value, we reverse.

VAN DEREN, C.J., and BRIDGEWATER, J., concur.

Review granted at 165 Wn.2d 1036 (2009).